UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00141-KJM |
| Plaintiff, | ORDER |
| v. | |
| Adam Fuller, | |
| Defendant. | |

Adam Fuller has been charged with a violent assault on a courthouse security officer on the front plaza of this District's Sacramento courthouse. Fuller suffers from schizophrenia and is not competent to stand trial. The government moves for an order directing Fuller to take antipsychotic medications, involuntarily if necessary, so that he may stand trial. *See generally Sell v. United States*, 539 U.S. 166 (2003). The motion is fully briefed and was submitted after oral arguments and an evidentiary hearing. *See* Mot., ECF No. 53; Opp'n, ECF No. 54; Reply, ECF No. 55; Minutes, ECF Nos. 56 & 62; Excerpts of Transcript of Feb. 2, 2021 Hearing (Hr'g Tr. Pt. 1), ECF No. 64; Further Excerpts of Transcript of Feb. 2, 2021 Hearing (Hr'g Tr. Pt. 2), ECF No. 65. The court granted the government's motion by bench order at a hearing on March 1, 2021. *See* Minutes, ECF No. 63. This order explains the court's reasoning.

/////

## I. BACKGROUND

According to a report from the Department of Homeland Security's Federal Protective Service, Fuller visited this District's Sacramento courthouse in August 2019 and attempted to file a case against the United States. *See* Rep. of Investigation at 3, Mot. Ex. A, ECF No. 53-1. He left without any problems, but later that night, he returned and told a security officer that if he did not get what he wanted, he would come back the next day and "fuck somebody up." *Id.* The next morning, he punched another security officer in the face outside the courthouse. *Id.* The officer sustained an injury to his forehead, which required several stitches. *Id.*

Sacramento Police soon found and detained Fuller near the courthouse. *Id.* After he was detained, he threatened to kill two federal inspectors because he was "at war" with the government. *Id.* "I want to kill military members and Law Enforcement people," he explained. *Id.* In an interview after officers informed him of his *Miranda* rights, he confessed to assaulting the security officer. *Id.* A criminal information was filed in this court the same day, and a grand jury returned an indictment a few weeks later. *See generally* Information, ECF No. 1; Indictment, ECF No. 10. Fuller was charged with the forceable assault of a federal officer with bodily injury in violation of 18 U.S.C. § 111(a)(1) and (b). *See* Indictment at 1.

Fuller refused to come to court for a status conference the next month. *See* Minutes, ECF No. 18. His appointed counsel agreed with the government that there was reason to believe he was not mentally competent to stand trial. *See* Order Directing Competency Eval. at 1, ECF No. 29. The court ordered an evaluation of his competency, *see id.* at 1–2, and after the evaluation was complete, the parties agreed that he could not stand trial, *see* Stip. & Order at 2, ECF No. 43. He was committed to federal custody in Missouri for treatment. *See id.*

Dr. Ashley K. Christiansen, a forensic psychologist, and Amanda L. Reed, M.A., a psychology intern, met with Fuller weekly in the federal medical facility, occasionally with another doctor, Robert Sarrazin, M.D., the facility's chief of psychiatry. *See generally* Christiansen Rep., ECF No. 48 (under seal);[1] Hr'g Tr. Pt. 1 at 8. Fuller could explain some basics

---

[1] This order cites the report and related treatment plan using the page numbers applied by the court's CM/ECF system to the top right of each page.

about his life, but he was generally uncooperative, unreliable, and often returned to his delusions—beliefs that he was at war with the government, that he had detonated atomic bombs, that the government was torturing his family, and that he received radio transmissions through a device installed in his nose, among other things. *See* Christiansen Rep. at 5, 7, 8, 10, 12. These delusions caused him great distress. *See id.* at 11. He also suffered from auditory hallucinations and disorganized thought. *See id.* at 5–12; *see also* Hr'g Tr. Pt. 1 at 10–11. Although he was not a trustworthy source of information about his own past, the doctors were satisfied that his condition was not the product of an injury. *See* Christiansen Rep. at 4; Hr'g Tr. Pt. 1 at 37. Christiansen and Reed diagnosed Fuller with "schizophrenia, continuous" under the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders. *See* Christiansen Rep. at 12–13.

Fuller often became aggressive and made threats against staff when they asked about his mental health and medication. *See, e.g.*, *id.* at 5, 8–9, 10. He insisted that he did not have a mental illness, and he refused medication. *Id.* at 8. He believed his family had forbidden the staff from offering him medications, and he said his family did not want him to be treated. *Id.* He also refused individual and group therapy. *Id.* at 9, 12. Fuller did say that he had taken Zyprexa and Risperdal in the past, which are both antipsychotic medications, and he mentioned those drugs specifically by name. *See id.* at 5. He said that when he took these medications, people stopped talking on the radio in his head. *Id.* But he found medication unnecessary. *See id.* Although the medical center staff was skeptical of Fuller's memory, they were satisfied that his account of successful treatment with Zyprexa and Risperdal was reliable. *See* Hr'g Tr. Pt. 1 at 16–17, 43.

Christiansen and Reed concluded that Fuller could not understand the basics of the claims against him. He said many times that the case would soon be dropped; he seemed to be biding his time until he was inevitably exonerated. *See, e.g.*, Christiansen Rep. at 9, 10; *see also* Hr'g Tr. Pt. 1 at 24. His legal strategy seemed to be derived entirely from his delusions. *See* Christiansen Rep. at 12–13. He did not trust his attorney. *See id.* at 13. He thought she was working for the government. *See id.* Christiansen and Reed thus confirmed Fuller was not competent to stand trial. *Id.* at 13.

/////

Fuller's condition is chronic. *See id.* at 11, 14–15. According to Christiansen, it will not improve without antipsychotic medication, which is the first-line, "gold standard" treatment for schizophrenia under the most recent guidelines of the American Psychiatric Association. *See* Hr'g Tr. Pt. 1 at 9, 13–14, 27. In Christiansen's opinion, antipsychotic medications are substantially likely to restore Fuller to competency. *See id.* at 17–19. She believes that given Fuller's characteristics, his chance of successful treatment and competency is 70–87%. *See id.* at 18–19; *see also* Hr'g Tr. Pt. 2 at 4 ("I would feel comfortable saying he is substantially likely at a[n] . . . approximately 75 percent likelihood of being restored to competency."). Psychotherapy might also be helpful, but only alongside a regime of antipsychotic medication. *See* Christiansen Rep. at 14–15; Hr'g Tr. Pt. 1 at 14. In her experience, any side effects Fuller might experience when taking antipsychotic medications would not interfere with his ability to stand trial. *See* Christiansen Rep. at 14.

Sarrazin agrees Fuller's condition is chronic and unlikely to improve without antipsychotic medications. *See* Treatment Plan at 5, ECF No. 50 (under seal);[2] Hr'g Tr. Pt. 1 at 47–48. Antipsychotic medications reduce hallucinations, lessen the intensity of delusions, and help disorganized thinking. *See* Hr'g Tr. Pt. 1 at 47–48. In Sarrazin's opinion, antipsychotic medications are the preferred treatment for people with conditions like schizophrenia and have dramatically improved the lives of many patients. *See* Treatment Plan at 5. Sarrazin would recommend them to Fuller regardless of his current incarceration and criminal charges. *See* Hr'g Tr. Pt. 1 at 55–56. "Other interventions like group therapy, family therapy, supported housing, supported job situations," and other similar treatments, in Sarrazin's experience, are only helpful after antipsychotic medications. Hr'g Tr. Pt. 1 at 48–49. Sarrazin agrees with Christiansen that the chance of successful treatment is about 75 percent. *See* Hr'g Tr. Pt. 1 at 57.

Sarrazin proposed a treatment plan. His plan lists five potential medications, but the medical facility would not administer all five at once; it would use only one at a time in an iterative process to find the best medication and dose. *See id.* at 45. Sarrazin proposes beginning with olanzapine because Fuller said that it alleviated his hallucinations in the past. *See id.* at 42–

---

[2] *See supra* note 1.

45; Treatment Plan at 2–3. The beginning doses would be at the bottom of the dosing range, and then would increase if necessary. *See* Hr'g Tr. Pt. 1 at 45; Treatment Plan at 2–3. If the court ordered Fuller to accept antipsychotic medication, staff at the medical center would explain the order and ask Fuller to cooperate. *See* Treatment Plan at 2–3. If he agreed, he would receive oral medications. *See id.* But if Fuller refused medication despite a court order, then the medical center would use restraints and inject long-acting drugs. *See id.* at 3–4. The medical facility has a "use of force team" that restrains patients on their beds while a nurse injects the medication. *See* Hr'g Tr. Pt. 1 at 33–35. Nursing staff could also inject lorazepam, a short-acting antianxiety drug, if Fuller became combative or agitated. *See* Treatment Plan at 4. The proposed treatment plan would require the full four-month period permitted by 18 U.S.C. § 4241(d)(1). *See* Treatment Plan at 5–6; Hr'g Tr. Pt. 1 at 52–53. Doctors and support staff would talk to Fuller about his illness and help him understand his symptoms in an attempt to restore him to competency. *See* Hr'g Tr. Pt. 1 at 30–31. At the end of the four months, Christiansen would evaluate Fuller again and give an updated opinion whether he was competent. *See* Hr'g Tr. Pt. 1 at 53.

Antipsychotic medications have side effects. Their most common side effects can usually be managed or eliminated, and many of these side effects would not prevent Fuller from participating meaningfully in his defense. *See* Treatment Plan at 5; Hr'g Tr. Pt. 1 at 51–54. Some antipsychotics have sedative effects, for example, and can be given before bed. *See* Hr'g Tr. Pt. 1 at 49. Others have "activating" effects; they can be taken in the morning. *See id.* at 50. Antipsychotic drugs might also cause tremors, stiffness, and restlessness—especially the so-called "first-generation" antipsychotics that Sarrazin would use if other medications were unexpectedly ineffective—but these side effects can be mitigated by splitting up doses and using secondary medications. *See id.* at 49–50. Weight gain, changes in blood sugars and lipids, and other metabolic changes are also potential side effects of the medications Sarrazin proposes, so the medical center would monitor Fuller's blood sugars, cholesterol, weight, and overall health, *see id.* at 50; Treatment Plan at 4–5.

/////

More serious side effects are also possible, but rare. Neuroleptic malignant syndrome, which occurs in about two percent of patients, can cause extreme stiffness and high temperatures. *See* Hr'g Tr. Pt. 1 at 53–54; *see also* Hr'g Tr. Pt. 2 at 5–6 ("[I]t's 0.07 percent to 2 percent of individuals treated with antipsychotic medications in the literature . . . ."). About two percent of patients also experience tardive dyskinesia—involuntary movements of the tongue and mouth. *See* Hr'g Tr. Pt. 1 at 53–45; *see also* Hr'g Tr. Pt. 2 at 5 ("Tardive dyskinesia is approximately 2 percent, I believe, in the population."). Sudden death is also possible. *See* Hr'g Tr. Pt. 1 at 54. In studies of the effects of antipsychotics, sudden death occurred 7 times per 10,000 person-years in the general population and 10 to 15 times per 10,000 person-years in populations treated with antipsychotics. Hr'g Tr. Pt. 2 at 6. That is, sudden death was very rare in both populations, but slightly less rare in the population that received antipsychotics. Nursing staff would watch for serious side effects 24 hours a day, and if necessary, help would be available right away, including in a nearby community hospital. *See* Hr'g Tr. Pt. 1 at 54–55.

The government moves to compel the administration of antipsychotic medications under Sarrazin's treatment plan. *See* Mot. Inv. Med., ECF No. 53. Fuller opposes the motion through his appointed counsel, Opp'n, ECF No. 54, and briefing is complete, *see* Reply, ECF No. 55. The court held an evidentiary hearing in early February. *See* Minutes, ECF No. 62. Christiansen and Sarrazin were qualified as experts on the diagnosis and treatment of mental disorders. *See* Hr'g Tr. Pt. 1 at 2–7, 40–42. Christiansen's report and Sarrazin's proposed treatment plan were admitted. *See id.* at 7, 56. The court granted the government's motion by bench order on March 1, 2021 with a written order to follow.

**II.   LEGAL STANDARD**

The government may administer antipsychotic medications to a mentally ill criminal defendant against that person's will if it shows (1) "that important governmental interests are at stake," (2) "that involuntary medication will significantly further those concomitant state interests," (3) "that involuntary medication is necessary to further those interests," and (4) "that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 180–81 (emphasis omitted). "[T]he government

6

has the burden of establishing the facts necessary to allow it to prevail as to each *Sell* factor by clear and convincing evidence." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010).

### III.  ANALYSIS

#### A.  Whether the Government's Interests are Important

The court previously found that the government has an important interest in bringing this case to trial, *see* Minutes, ECF No. 56, and reaffirms that finding here.

The importance of the government's interest is evaluated in two steps. *United States v. Onuoha*, 820 F.3d 1049, 1054 (9th Cir. 2016). First, the crime must be "sufficiently serious." *Id.* (citation and quotation marks omitted). The Supreme Court has held that "the government has an important interest 'in bringing to trial an individual accused of a serious crime.'" *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (quoting *Sell*, 539 U.S. at 180). The starting point in deciding whether a crime is "serious" is the likely Sentencing Guidelines range. *See Onuoha*, 820 F.3d at 1054–55. If that range is lengthy—usually about three years or more—the crime is usually "serious." *See id.*; *see also Gillenwater*, 749 F.3d at 1101. But a shorter expected sentence does not automatically disprove seriousness. *See Onuoha*, 820 F.3d at 1055. A court must also consider the specifics of the alleged crime and the defendant's criminal history, among other factors. *See id.* In *Onuoha*, for example, the court held that the defendant's crime was "serious" despite a relatively low Guideline range of 27 to 33 months because the defendant, a former airport security officer, had called the airport with an apparent bomb threat just before the anniversary of the September 11 attacks. *See id.* at 1055–56.

Fuller's crime is "serious" by this standard. The likely Guideline range is between 30 and 57 months, depending on the severity of the alleged assault and whether he accepts responsibility, among other factors. *See* Mot. at 4; Opp'n at 3–4. His decision to carry through with a threat, and to do so on the steps of a courthouse, shows clearly that his alleged conduct was serious. Even unfulfilled or vague threats to federal officers make for serious crimes. *See Onuoha*, 820 F.3d at 1055; *Gillenwater*, 749 F.3d at 1101. The government has an important interest in

/////

convicting Fuller "to show others that such conduct will result predictably in conviction and a serious penalty of incarceration." *Onuoha*, 820 F.3d at 1055.

The second step in deciding whether an alleged crime was "serious" is to consider whether any "special circumstances" lessen the importance of the government's interest. *Id.* (citation and quotation marks omitted). Refusing drugs "may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180. A court must therefore compare "the potential for and anticipated length of future civil commitment" with "the period of confinement that could reasonably be expected if the defendant were restored to competency and convicted of the charged offense." *United States v. Brooks*, 750 F.3d 1090, 1097 (9th Cir. 2014). The government's interest might also wane if the defendant has already been confined and that confinement would be credited against any sentence that might later be imposed. *See Ruiz-Gaxiola*, 623 F.3d at 694–95. If the defendant's mental disorder contributed to the alleged offense, the government's interest in a prosecution might also be weaker. *See Gillenwater*, 749 F.3d at 1102. But a link between the defendant's mental health and his alleged crime might also make a prosecution more important if a mental condition increases the chances of a repeat offense. *See id.*; *see also Ruiz-Gaxiola*, 623 F.3d at 695.[3] "The district court should also consider any other significant factors that could strengthen or weaken the governmental interests . . . , including the extent to which delaying the prosecution could jeopardize the government's position at trial." *Brooks*, 750 F.3d at 1097.

Here, there is no evidence that Fuller faces civil commitment, and a hypothetical commitment does not diminish the government's interest in prosecution. *See Onuoha*, 820 F.3d at 1057. Although Fuller has already been confined for about a year and half, he would face many more months' and perhaps years' confinement if convicted and sentenced within the likely Guideline range, so his pre-trial confinement does not neutralize the government's interest in his

---

[3] The defendant's possible danger to himself or others, by contrast, is not relevant here. *See Onuoha*, 820 F.3d at 1056 (holding that a defendant's "potential for future violence" is "wholly unnecessary to justify involuntary medication for the purpose of permitting trial and conviction").

prosecution. *See Ruiz-Gaxiola*, 623 F.3d at 695. It is unlikely that Fuller could be restored to competency without medication. Delaying his prosecution until he regains competency could therefore prevent the government from prosecuting him at all. *See Sell*, 539 U.S. at 180 ("[I]t may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost."). Delays that prevent a prosecution might also prevent the government from seeking supervised release. This risk also shows the government's interest is important. *See Gillenwater*, 749 F.3d at 1101–02. Finally, although Fuller's mental disorder was connected to his alleged offense, that connection strengthens the government's interest in this case. His delusions are likely to continue without treatment. *See id.* at 1102. The government has thus satisfied its burden under the first part of the *Sell* test.

**B.    Whether Medication Will Significantly Further the Government's Interests**

The second part of the *Sell* test also has two subparts. "First, the government must show that 'administration of the drugs is substantially likely to render the defendant competent to stand trial.'" *Id.* at 1102 (quoting *Sell*, 539 U.S. at 181). It is not enough for a drug to be designed or intended to treat the defendant's condition. *See Ruiz-Gaxiola*, 623 F.3d at 696. Second, the government "must show that 'administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense.'" *Gillenwater*, 749 F.3d at 1102 (quoting *Sell*, 539 U.S. at 181).

Here, first, the government has presented clear and convincing evidence that the antipsychotic medications described in Sarrazin's report are substantially likely to prepare Fuller to stand trial competently. It has offered uncontradicted reports and testimony from Christiansen and Sarrazin. Both met with Fuller, and both concluded that he suffers from schizophrenia. There is no dispute that both doctors are qualified to make that diagnosis. There is no dispute that Dr. Sarrazin is qualified to prescribe treatments for schizophrenia. There is no dispute that antipsychotic medications are the first treatment experts prescribe for schizophrenia. There is no dispute that these medications successfully reduce the distressing symptoms and delusions that separate people from their families and communities. Both Christiansen and Sarrazin agree

/////

antipsychotic medications are substantially likely to prepare Fuller to stand trial competently. They both credibly estimate his chances of success to be about 75 percent.

In these ways, this case is similar to *Gillenwater* and others in which highly qualified and experienced doctors offered uncontradicted opinions that antipsychotic medications were likely to restore defendants to competence. *See* 749 F.3d at 1102–03. It differs starkly from others, such as *Ruiz-Gaxiola*, in which the government relied on the shaky and disputed opinions of experts who admitted, for example, that there was "a paucity of data" and "no explicit practice guideline or consensus" on how to treat patients with the defendant's condition. *See* 623 F.3d at 696–97.

Second, although the side effects of the medications Sarrazin proposes are not trivial—they include sudden death—the frequency of these side effects is very low. The most serious side effects are observed in fewer than two percent of total cases. According to Sarrazin's uncontradicted testimony, other less serious but unpleasant side effects are unlikely to prevent Fuller from participating in his defense.

The government has thus carried its burden to show by clear and convincing evidence that the proposed treatment plan is substantially likely to render Fuller competent to stand trial. This is not to say that Zyprexa, Risperdal, and the other alternative medications proposed in Sarrazin's report are guaranteed to restore Fuller's competency. Christiansen and Sarrazin agreed at the evidentiary hearing that Fuller might not be competent to stand trial even after the proposed treatment is completed. But the government need not prove success to a certainty. It need only prove that the proposed treatment plan is substantially likely to render Fuller competent and that side effects are substantially unlikely to prevent him from participating in his defense. It has done so here. *See, e.g.*, *Gillenwater*, 749 F.3d at 1103 (agreeing the government had carried its burden in part because it cited research showing that "more than 70% of persons suffering from delusional disorder saw an improvement in their symptoms when treated with antipsychotic medication").

### C.     Whether Medication is Necessary to Further the Government's Interests

Under the third part of the *Sell* test, the government must prove that involuntary medication is necessary to further its important interests. *See Sell*, 539 U.S. at 181. It must show

"any alternative, less intrusive treatments are unlikely to achieve substantially the same results," and the court must "consider less intrusive means for administering the drugs." *Id.*

The evidence here shows clearly and convincingly that no alternative to involuntary medication is available. Reed and Christiansen's report details the medical center's months-long unsuccessful efforts to talk to Fuller about his mental disorder, to persuade him to accept medication voluntarily, and to interest him in group and individual psychotherapy. Fuller responded to these efforts with denials, aggression, threats, and anger. *See, e.g.*, Hr'g Tr. Pt. 1 at 16. He does not believe he suffers from a mental disorder. He believes his family has forbidden treatment. Reed, Christiansen, and Sarrazin agree that medication is the only treatment that will likely remediate Fuller's delusions and other symptoms. No evidence suggests otherwise. In these circumstances, persuasion and psychotherapy are not possible. *See, e.g.*, *Gillenwater*, 749 F.3d at 1103–04 (affirming an order to administer antipsychotic medication involuntarily in part because the defendant did not "recognize that he suffer[ed] from a mental disorder and [did] not believe that he need[ed] treatment."); *Ruiz-Gaxiola*, 623 F.3d at 702–03 (reasoning similarly).

The Supreme Court has also instructed district courts to consider, as an alternative to involuntary medication, "a court order to the defendant backed by the contempt power." *Sell*, 539 U.S. at 181. The record of Fuller's time in the medical center shows clearly that this alternative is very unlikely to succeed. Fuller's distrust of the government is longstanding and deeply rooted. A court order and threats of involuntary confinement would almost certainly not overcome his distrust. To the contrary, threats of confinement are more likely to confirm his belief that the government is fighting a war against him. His alleged crime is, after all, an attack on a courthouse security officer. Voluntary medication is therefore not a viable alternative here. *See Gillenwater*, 749 F.3d at 1104. ("[A] district court does not clearly err in rejecting voluntary psychotherapy as an alternative, less intrusive treatment option where, as here, it is far from clear both that it can be effectively performed within the constraints of the prison environment and that the defendant will engage in it.").

Sarrazin's proposed treatment plan also builds in less intrusive means than forceful injections. Treatment would begin with requests that Fuller participate and attempts to persuade.

11

Staff would explain the court's order and offer him oral medications. *See* Treatment Plan at 2–3; *see also* Hr'g Tr. Pt. 1 at 21. Only if these efforts proved unsuccessful would staff restrain Fuller on his bed and administer medications forcefully. *See* Treatment Plan at 3–4. After the medications took effect, staff would again ask Fuller to accept the medications voluntarily. Many people in similar circumstances accept medications after rejecting them at first. *See* Hr'g Tr. Pt. 1 at 21–22. As discussed at the evidentiary hearing, staff would also help Fuller recognize his symptoms for what they are. *See id.* at 30–31. These built-in alternatives further support the government's motion. *See Ruiz-Gaxiola*, 623 F.3d at 703 (approving of a treatment plan that began with a request that the defendant "voluntarily take medication orally").

In sum, the record shows that no alternative to involuntary medication is available or likely to succeed. The government has carried its burden to show by clear and convincing evidence that involuntary medication is necessary to further its important interest in bringing this case to trial.

### D. Whether Medication is Medically Appropriate

The fourth and final part of the *Sell* test requires the government to show that "administration of the drugs is medically appropriate." *Sell*, 539 U.S. at 181 (emphasis omitted). "[T]he government must show that involuntary medication is in 'the patient's best medical interest in light of his medical condition.'" *Gillenwater*, 749 F.3d at 1104 (quoting *Sell*, 539 U.S. at 181). The court must "consider 'the long-term medical interests of the individual rather than the short-term institutional interests of the justice system.'" *Id.* (quoting *Ruiz-Gaxiola*, 623 F.3d at 703).

Here, Sarrazin's proposed treatment plan would begin with the lowest effective doses of second-generation antipsychotics, including risperidone and aripiprazole, and doses would be increased only if necessary. *See* Treatment Plan at 2, 3–4. No evidence suggests the proposed doses are abnormal or higher than those that would be administered in the ordinary course. *Cf. Onuoha*, 820 F.3d at 1058 (finding that the proposed treatment was not in the defendant's interest because, among other reasons, doses were unnecessarily high). Fuller is not suffering from any other medical conditions that might complicate his treatment. *See, e.g.*, Hr'g Tr. Pt. 1 at 17–19.

The medical center would closely monitor him for adverse reactions and would adjust his treatment if necessary to reduce side effects. Administering antipsychotic medications might also permit Fuller to participate meaningfully in counseling and other treatments voluntarily. *See also Gillenwater*, 749 F.3d at 1104–05 (affirming a plan for involuntary medication with similar features). And as both Christiansen and Sarrazin explained at the evidentiary hearing, Sarrazin's proposed treatment will likely improve Fuller's life significantly by alleviating the delusions and hallucinations that cause him such great distress. *See* Hr'g Tr. Pt. 1 at 15, 51. The record here shows clearly and convincingly that it is in Fuller's interest to receive the proposed treatment— not only as a defendant who deserves to understand the charges of serious crimes the government has filed against him, but also as a patient in need. *See Ruiz-Gaxiola*, 623 F.3d at 703 (emphasizing the Supreme Court's choice of the word "patient" rather than "defendant" in describing this part of the *Sell* test). The government has thus shown clearly and convincingly that the proposed treatment plan is in Fuller's best interests as a patient.

The defense objects that the proposed treatment plan is not in Fuller's best interests because some aspects of that plan might not continue in the longer term. If, for example, he returns to Sacramento and the local jail, continued counseling and education might not be possible. *See* Hr'g Tr. Pt. 1 at 31. Although that may be true, it is no reason to abandon the proposed plan entirely. Most people with schizophrenia do not "also engage in adjunctive therapies" such as psychotherapy and counseling. Hr'g Tr. Pt. 1 at 29. They manage their illness with medication alone. *See id.*; *see also* Hr'g Tr. Pt. 2 at 2 ("I can't say that . . . adjunctive psychotherapy . . . is crucial, necessarily. I would say the more important part is maintenance on medication."). At this stage, the proposed treatment plan is in Fuller's best medical interest on the whole. If complications arise, this order does not prohibit him and his counsel from returning to the court for relief.

The defense also objects that the proposed plan is not in Fuller's interest because he is past the age at which treatment for schizophrenia is usually most effective. Treatment for men with schizophrenia should normally begin when patients are in their twenties. *See* Hr'g Tr. Pt. 1 at 26. Fuller is in his mid-thirties. *See id.* As Christiansen testified, however, people may

13

successfully manage schizophrenia despite beginning treatment much later, and she believes that is substantially likely in Fuller's case. *See id.* at 17–19.

Finally, the defense argues the proposed plan is not in Fuller's best interests because he will be treated in isolation. *See* Hr'g Tr. Pt. 2 at 3–4. Some experts have contended that isolation is harmful to people with schizophrenia. *See id.* It is undisputed, however, that Fuller's isolation is necessary for his own and others' safety. *See id.* The medical center has also offered him group counseling, and if antipsychotic medications are effective, the medical center can move him into a more open and social environment. *See* Hr'g Tr. Pt. 1 at 62. On this record, the chances of Fuller's continued isolation are *lower* if he receives the medications proposed.

## IV. CONCLUSION

The government has carried its burden under the *Sell* test by clear and convincing evidence, and **its motion is granted**.

At the hearing in which this court issued its bench order, Fuller requested a stay pending his anticipated interlocutory appeal. Orders directing involuntary medication may be immediately appealed under the collateral order doctrine. *See Sell*, 539 U.S. at 175–77. They raise "questions of clear constitutional importance." *Id.* at 176. An interlocutory appeal could not vindicate Fuller's interest in avoiding involuntary medication if this court's order were not stayed. District courts often stay orders directing involuntary medication pending appeal. *See Onuoha*, 820 F.3d at 1053; *Brooks*, 750 F.3d at 1095. **This order is therefore stayed pending Fuller's anticipated appeal.** The stay will be **lifted automatically** if Fuller does not file a timely notice of appeal.

This order resolves ECF No. 53.

IT IS SO ORDERED.

DATED: March 10, 2021.

CHIEF UNITED STATES DISTRICT JUDGE